1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| STEMCELL TECHNOLOGIES CANADA INC., et al., | Case No. 21-cv-01594-VC (LB) |
| Plaintiffs, | |
| v. | **DISCOVERY ORDER** |
| STEMEXPRESS, LLC, et al., | Re: ECF No. 74 |
| Defendants. | |

**INTRODUCTION**

The parties are biotech companies. StemExpress supplied cell products (sometimes referred to

by the parties as "leukopak" products) to STEMCELL. The parties' business relationship was

governed by a contract that had confidentiality provisions. When the relationship ended, the parties

sued each other for, among other claims, breach of contract. StemExpress also claimed that through

STEMCELL's quality audits, STEMCELL gained access to and misappropriated StemExpress's

trade secrets, in violation of the California Uniform Trade Secrets Act (CUTSA), to start its own

competing business.[1] The current discovery dispute is about the sufficiency of StemExpress's

designation of its trade secrets. STEMCELL's main argument is that the alleged trade secrets are

---

[1] First Am. Compl. – ECF No. 20; First Am. Countercls. – ECF No. 51. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

ORDER – No. 21-cv-01594-VC (LB)

United States District Court
Northern District of California

1     not actually trade secrets. That is a merits challenge to the designations, but since the parties filed

2     their letter brief, the trial judge denied the motion to dismiss the trade-secret claims.[2] For reasons

3     that include STEMCELL's access to confidential information governed by the parties'

4     confidentiality agreement, StemExpress's designations are sufficient to allow discovery.

5

6     **STATEMENT**

7     **1.  Allegations in First Amended Counterclaims**

8     StemExpress's claims are primarily for breach of contract and theft of trade secrets.[3] It supplies

9     "researchers and clinicians with human tissue and primary cell products through blood collection,

10    bone marrow collection, and primary cell isolation" at its donor-collection and lab facilities in seven

11    locations in the U.S.[4] Before the parties began their negotiations for a potential supply agreement

12    for StemExpress to supply STEMCELL with cell products, they signed a confidentiality agreement.

13    It defined "confidential information" as follows:

14      (a) "Confidential Information" means, in relation to a party to this Agreement,
information known at used by such party in connection with its business or

15      technology that is confidential to such party and includes, without limitation, trade
secrets, know-how, show-how, inventions, creations, designs, methods, software,

16      techniques, processes and other intellectual properly and technical information,
customer information, financial information, marketing information, and

17      information as to business opportunities, strategics and research and development,

18      (b) all designs, analyses, compilations, forecasts, studies or other materials

19      prepared by a party to this Agreement will, to the extent they comprise any of the
other party's information described in §(a), be deemed to be the Confidential

20      Information of such other party, and

21      (c) any samples of materials provided by a party to this Agreement to the other
during the course of their business relationship will be deemed to be the

22      Confidential Information of such first party.[5]

23

---

24    [2] Order – ECF No. 78 (denying motion to dismiss trade-secret and breach-of-confidentiality-agreement

25    counterclaims); 2/10/2022 Tr. – ECF No. 75.

     [3] First Am. Countercls. – ECF No. 51 at 22–27; 2/10/2022 Tr. – ECF No. 75 at 4:4–9; Order – ECF

26    No. 78 at 1. The UCL claim does not survive, at least for now. Order – ECF No. 78 at 1; 2/10/2022 Tr.
– ECF No. 75 at 4:4–9.

27    [4] First Am. Countercls. – ECF No. 51 at 4 (¶ 11).

28    [5] *Id.* at 5 (¶ 13).

United States District Court
Northern District of California

1    The agreement had a non-disclosure provision that, in short, required both parties to keep the

2    confidential information confidential. Among other terms, it required written consent of the

3    "Discloser" to disclose information and allowed the disclosure of confidential information to a

4    party's employees, agents, and affiliates with a "definable need to know" and only if they "were

5    informed" that the information was confidential and "were bound" by the same confidentiality

6    restrictions in the non-disclosure provision. The confidentiality provision also said that the

7    "Recipient" could not analyze or reverse engineer samples.[6]

8    Ultimately, the parties signed a supply agreement for StemExpress to supply STEMCELL with

9    bone marrow, blood, frozen primary cells, and "human peripheral blood products."[7] It had a

10   confidentiality provision defining confidential information:

11   > (a) "Confidential Information" shall mean any information or data disclosed by one
     > Party ("Discloser") to the other Party ("Recipient"), whether orally or in writing,
12   > that is designated as confidential or that reasonably should be understood to be
     > confidential given the nature of the information and the circumstances of
13   > disclosure, including, without limitation, information and materials regarding
     > Discloser's (i) patents, trade secrets, Know-How, processes, procedures,
14   > techniques, and other Intellectual Property; (ii) financial and business affairs; (iii)
     > proposed or existing projects, programs, products, and materials; (iii) sales and
15   > marketing materials and methodologies; and (iv) employees, clients, customers,
     > vendors, and suppliers. "Confidential Information," however, shall not include any
16   > information which was (a) known to Recipient before disclosure to Recipient under
     > this Agreement, (b) is generally known or generally available in the public domain,
17   > or becomes publicly known and made generally available in the public domain after
     > disclosure to the Recipient under this Agreement, or (c) is received by the
18   > Recipient from a source other than the Discloser, in both cases other than by a
     > breach of an obligation of confidentiality.[8]
19

20

21   The non-disclosure provision required the confidential information to be held in "strict

22   confidence" and prohibited disclosure to anyone except for compliance of the party's obligations

23   under the supply agreement.[9]

24

25

---

26   [6] *Id.* at 5–6 (¶ 14).

27   [7] *Id.* at 6–7 (¶ 18).

     [8] *Id.* at 8 (¶ 24(a)) (emphasis removed).

28   [9] *Id.* (¶ 24(b)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

When the parties entered into their contracts, "STEMCELL did not possess independent knowledge, skill, or information relating to procur[ing] blood and bone marrow collection or manufactur[ing] primary cell isolation products," and "StemExpress was *the* procurer and manufacturer." In short, STEMCELL "did not have the independent know-how to operate" collection centers, and it had no collection centers, which is why it contracted with StemExpress.[10]

The supply agreement's initial term ended on May 1, 2019, and automatically renewed for three years (subject to any party's notice of termination at least twelve months before the end of the term). On April 26, 2018, StemExpress notified STEMCELL that it was not renewing the contract and asked to renegotiate the terms. The parties negotiated from 2018 to early 2019 and were close to reaching an agreement. On April 1, 2019, STEMCELL ended the negotiations.[11]

"On multiple occasions from 2013 to 2018, STEMCELL performed 'quality audits' of StemExpress" that allowed it access to StemExpress's "confidential information and trade secrets in connection with its procurement and donor collections, the laboratory manufacturing operations, and business plans. STEMCELL then produced confidential audit reports using StemExpress'[s] information . . . [that] contain discussions of StemExpress's confidential procurement and manufacturing operations. . . ."[12] To facilitate the audits, StemExpress gave STEMCELL access to "troves of confidential procurement and manufacturing information relating to its know-how, processes, procedures, and techniques," pursuant to the confidentiality protections in the supply agreement.[13] During its audit process, STEMCELL asked for StemExpress's confidential information and discuss it in the reports, including StemExpress's evaluation of cities to potentially expand its donor sources, donor information (such as processes for screening, management of donor pools, and processes to achieve optimum blood draws), and information about manufacturing, quality control, logistics, equipment, procurement, and operating procedures.[14]

---

[10] *Id.* at 8–9 (¶ 25).

[11] *Id.* at 9–10 (¶¶ 29–32).

[12] *Id.* at 10 (¶ 33).

[13] *Id.* at 10–11 (¶ 36).

[14] *Id.* at 10–14 (¶¶ 35, 37–45).

ORDER – No. 21-cv-01594-VC (LB)                    4

United States District Court
Northern District of California

1    STEMCELL then started a company called Canventa, allegedly with StemExpress's

2    confidential information and trade secrets in order to "knockoff" StemExpress's business.[15]

3    STEMCELL audited StemExpress's facility in Folsom, California, in April 2018 — one week after

4    it registered the initial corporation called Fundamenta (later changed to Canventa) — regarding

5    confidential aspects of StemExpress's "procurement and manufacturing facilities and business."[16]

6    STEMCELL's access to confidential information was reflected in its audit agenda, sent in March

7    2018, and audit report, sent in September of 2018, and included "extensive and detailed confidential

8    and proprietary information about StemExpress."[17]

9    On October 4, 2018, STEMCELL applied for building permits in Emeryville, California under

10   the name of Canventa for "TI for office to lab, office & clinic," with the proposed work valued at

11   $940,000. From public records, STEMCELL is spending "additional hundreds of thousands of

12   dollars in purchasing the same procurement and manufacturing equipment as StemExpress and that

13   they accessed and documented as part of their audits and inquiries," including from confidential

14   information. "With the knowledge and use of StemExpress'[s] confidential procurement and

15   manufacturing information, Defendants were essentially able to replicate, through Canventa,

16   StemExpress'[s] procurement and manufacturing operations." StemExpress later discovered that

17   senior officials at STEMEXPRESS were actively concealing Canventa's existence from

18   StemExpress, "even worrying that they may get caught during the renegotiations of the Supply

19   Agreement." During this time, StemExpress did not know about Canventa or STEMCELL's plan to

20   use StemExpress's confidential procurement-and-manufacturing information to form Canventa,

21   which "would be a direct competitor of StemExpress."[18] Two weeks later, on October 17, 2018,

22   STEMCELL audited StemExpress's Boston site and prepared a full audit report.[19]

23

24

---

25   [15] *Id.* at 16 (¶ 1, 7, 52).

26   [16] *Id.* at 17 (¶ 56).

     [17] *Id.* at 16–18 (¶¶ 55, 58).

27   [18] *Id.* at 18 (¶ 60).

28   [19] *Id.* at 18–19 (¶ 61).

United States District Court
Northern District of California

1    During their contract renegotiations, StemExpress would not agree to include "an ability to

2    purchase StemExpress as part of the Supply Agreement." As a result, STEMCELL worked

3    systematically to "obtain as much confidential information about StemExpress'[s] procurement and

4    manufacturing operations, with the intent of misusing" the information to form a competing

5    procurement-and-manufacturing facility, Canventa. StemExpress understands that STEMCELL

6    selected San Francisco as Canventa's location, knowing that StemExpress had "active plans" to

7    open its next facility in San Francisco.[20]

8    On February 18, 2021, during a conference call, StemExpress confronted STEMCELL about its

9    handling of StemExpress's confidential information. STEMCELL refused to answer any questions

10   about its handling of the information.[21]

11   In short, now the parties are competitors. The breach-of-contract claims (claims one and two)

12   are predicated on STEMCELL's alleged use of confidential information to "jumpstart and then

13   operate Canventa."[22] The misappropriation-of-trade-secrets claim is similarly predicated on theft of

14   confidential information that also constitutes trade secrets.[23]

15

16   **2.  Designation of Trade Secrets**

17   StemExpress designated twelve trade secrets. They include its internal processes for donor

18   screening, management of donor pools, "batch records" that apparently function as the "recipe books

19   for procurement and manufacturing," and quality-control test methods.[24]

---

[20] *Id.* at 19 (¶ 63).

[21] *Id.* at 20 (¶ 66).

[22] *Id.* at 22–25 (¶¶ 73–95).

[23] *Id.* at 25–26 (¶¶ 96–102).

[24] Designation of Trade Secrets – ECF No. 74-1 at 3–4; Order – ECF No. 78 at 2 (these allegations of "multiple categories of trade secrets . . . are of similar specificity to allegations in other cases in this district in which CUTSA claims have been permitted to go forward . . . and are sufficient to put the plaintiffs on notice of the boundaries within which the secret lies.") (cleaned up).

ORDER – No. 21-cv-01594-VC (LB)                6

United States District Court
Northern District of California

1

**ANALYSIS**

2    The parties dispute whether StemExpress's trade-secret designations are sufficient and, if they

3    are not, whether discovery (including the third-party subpoenas that the court authorized already)

4    should be stayed until StemExpress designates its trade secrets more particularly.[25] Neither party

5    disputes that CUTSA should apply. (The trial judge applies § 2019.210 "to a point" as a case-

6    management technique but does not view compliance with § 2019.210 as a legal requirement for

7    federal courts sitting in diversity.[26]) Applying § 2019.210 makes sense here: likely StemExpress's

8    discovery also is aimed at STEMCELL's trade secrets and confidential information. That said, this

9    case is about misappropriation of confidential information, not just misappropriation of trade

10   secrets, in violation of the parties' supply agreement's confidentiality clause. STEMCELL's audits

11   allowed it to obtain StemExpress's confidential information, copy its business model, and start

12   Canventa, a competitor. STEMCELL's audits allegedly reflect the confidential information. Given

13   this context, the court deems the identifications sufficient.

14   "In any action alleging the misappropriation of a trade secret under the Uniform Trade Secrets

15   Act. . . , before commencing discovery relating to the trade secret, the party alleging the

16   misappropriation shall identify the trade secret with reasonable particularity subject to any orders

17   that may be appropriate under Section 3426.5 of the Civil Code." Cal. Civ. Proc. Code § 2019.210.

18   Section 2019.210's reasonable particularity requirement is a flexible standard. *Brescia v.*

19   *Angelin*, 172 Cal. App. 4th 133, 148–49 (2009). Reasonable particularity does not require a party

20   to define its trade secret down to the finest detail or require a mini-trial on misappropriation before

21   plaintiff is allowed discovery. *Advanced Modular Sputtering, Inc. v. Super. Ct.*, 132 Cal. App. 4th

22   826, 835–36 (2005). Still, the plaintiff must "make some showing that is reasonable, i.e., fair,

23   proper, just and rational. . . [,] under all of the circumstances to identify its alleged trade secret in a

24   manner that will allow the trial court to control the scope of subsequent discovery, protect all

25   parties' proprietary information, and allow them a fair opportunity to prepare and present their best

26

27   [25] Joint Disc. Letter – ECF No. 74 at 2–4.

28   [26] 2/10/2022 Tr. – ECF No. 75 at 11:13–20, 29:20–25 (applying § 2019.210 "to a point" to allow "greater specificity on the trades secret disclosures").

ORDER – No. 21-cv-01594-VC (LB)                    7

1  case or defense at a trial on the merits." *Id*. at 836. "In a highly specialized technical field . . . a

2  more exacting level of particularity may be required to distinguish the alleged trade secrets from

3  matters already known to persons skilled in that field." *Perlan Therapeutics, Inc. v. Super. Ct.*,

4  178 Cal. App. 4th 1333, 1351 (2009).

5       In considering the adequacy of a trade-secret disclosure, "the designation should be liberally

6  construed, and reasonable doubts about its sufficiency resolved in favor of allowing discovery to

7  go forward." *Brescia*, 172 Cal. App. 4th at 149. Still, "a court does not abuse its discretion by

8  compelling a plaintiff to produce a clear, non-evasive trade secret statement." *Perlan*, 178 Cal.

9  App. 4th at 1352.

10       STEMCELL contends that "StemExpress has not distinguished what it does from matters of

11  general knowledge in the trade." Also, both parties "post content on their publicly accessible

12  websites addressing the . . . identified . . . trade secrets[,] and there is a vast body of public domain

13  information discussing them."[27] To illustrate these points, it characterizes the trade secrets:

14      [T]he first two claimed trade secrets are "StemExpress'[s] method, technique and
       process for screening potential biospecimen donors for inclusion within its donor

15      pool" and its "method, technique, and process for scheduling donors for collections
       of biospecimen samples." The next six claimed trade secrets are identified as

16      "proprietary step-by-step instructions" for processing sample and creating batch
       records for various products. The remaining claimed trade secrets are StemExpress's

17      "method and technique of designing and configuring its biospecimen collection
       center and laboratory," its "method, technique, and process for freezing products," its

18      "method, technique, and process for manufacturing off-catalogue custom isolated
       biospecimen products," its "IRB-approved donor consent template forms," and its

19      "process for producing a Certificate of Analysis for its products to ensure accuracy

20      and quality control needs are satisfied."[28]

21       It then gives five examples of why the designations are insufficient (although it also cites the

22  declaration of its "Vice President, Primary and Cultured Cells," who has a Ph.D. in biochemistry,

23  for the general proposition that "StemExpress's identification of its claimed trade secrets does not

24  come close to meeting the statutory requirement to identify them with specificity"):

25      [T]he 5th secret claims batch records for cord blood products but STEMCELL
       provided StemExpress with the specifications it requires, together with step-by-step

26

27  _____

   [27] Joint Disc. Letter – ECF No. 74 at 3.

28  [28] *Id.* at 2.

ORDER – No. 21-cv-01594-VC (LB)         8

United States District Court
Northern District of California

1
2
3
4
5

instructions to process cord blood, isolate cells, and analyze cord blood products. The 6th secret is described as batch records for bone marrow products but STEMCELL provided StemExpress with the specifications it requires. The 7th secret is batch records for "custom" biospecimen sample products when it is the customers, not STEMCELL, who determine what needs to be included in the batch records. The 4th secret claims batch records for mobilized leukopak products when not one of the STEMCELL entities makes such products. Remarkably, the 11th "secret" consists of forms that are available to everyone who donates blood specimens and therefore cannot be trade secrets as a matter of law.[29]

6

7       The challenges to designations 5, 6, and 7 are not challenges to the sufficiency of the

8   designations and instead are challenges to whether they are trade secrets at all: STEMCELL said

9   that it provided the specifications for 5 and 6, and customers determine what is included in 7. This

10  is a merits issue, and the trial judge denied the motion to dismiss the trade-secret claims.[30]

11  Similarly, the challenge to designation 4 is about relevancy: STEMCELL says it does not make

12  mobilized leukopak products. But StemExpress claims theft of confidential and trade-secret

13  information, and the facts are disputed, so the information is relevant. STEMCELL does not

14  address proportionality or burden. Fed. R. Civ. P. 26(b)(1).

15      The challenge to designation 11 is different: it apparently is a publicly available form.

16  StemExpress did not respond to this point. The court thus deems it insufficient.

17      In her declaration, STEMCELL's vice president also said that StemExpress is claiming trade

18  secrets that it actually obtained from STEMCELL, and STEMCELL, not StemExpress, had the

19  experience and expertise.[31] This too is a merits issue.

20      STEMCELL does not otherwise discuss the designations, either in the letter or in the

21  underlying motion to strike.[32] It does say generally (without any discussion of the designations)

22  that other businesses in the industry "engage in some or all of the activities described above,

23  meaning that StemExpress has not distinguished what it does from general knowledge in the

24

25  [29] *Id.* at 2 (citing Sauvé Decl. – ECF No. 66-1).

26  [30] Order – ECF No. 78; 2/10/2022 Tr. – ECF No. 75.

27  [31] Sauvé Decl. – ECF No. 66-1 at 7–10 (¶¶ 15–17) (analyzing StemExpress's deficiencies revealed in STEMCELL's audits).

28  [32] Joint Disc. Letter – ECF No. 74 at 1–3; Mot. to Strike – ECF No. 66.

United States District Court
Northern District of California

1   trade."[33] Its vice president said that StemExpress has not identified how its systems are different

2   than other companies in the industry and instead is describing commonplace categories of

3   information widely kept by similar companies and processes that those companies commonly

4   follow.[34] These general assertions do not give the court much to work with. STEMCELL does not,

5   for example, cite any cases (other than the general legal standards) where courts address similar

6   designations in similar contexts.

7       That said, a trade-secret designation must distinguish the alleged trade secret from information

8   that is already known to persons skilled in the field or is publicly available. *See, e.g., Imax Corp.*

9   *v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (a plaintiff "should describe the

10  subject matter of the trade secret with sufficient particularity to separate it from matters of general

11  knowledge in the trade or of special knowledge of those persons … skilled in the trade").

12  StemExpress did not counter STEMCELL's declaration by submitting its own declaration saying

13  (for example) that the information is not publicly available or is not known to those skilled in the

14  field. But given STEMCELL's failure to analyze the designations except for its arguments that the

15  trade secrets are not trade secrets, a counter-declaration is unnecessary.

16      Also, the trade-secret identifications are sufficient for at least two additional reasons: (1) the

17  parties had a business relationship where STEMCELL had access to identifiable confidential

18  information, and (2) StemExpress is not required to prove in its § 2019.210 statement that its trade

19  secrets are not generally known.

20      First, as StemExpress contends, the parties' business relationship — governed by a

21  confidentiality provision in the Supply Agreement and undisputedly involving access to confidential

22  information — means that discovery should go forward.[35] It is not as if the parties have no

23  understanding of the information at stake in the litigation.

24

25  [33] Joint Disc. Letter – ECF No. 74 at 2–3.

26  [34] Sauvé Decl. – ECF No. 66-1 at 4–6 (¶¶ 10–14) (referencing quality-control standards that companies
    must meet), 10–18 (¶¶ 19–28, 30) (addressing designations 1 through 10 and 12 and asserting that all

27  companies have similar methods, techniques, and processes for screening biospecimen donors and
    processing batch records).

28  [35] Joint Disc. Letter – ECF No.74 at 3–4.

United States District Court
Northern District of California

1    To support this argument, StemExpress cites *Alta Devices*, where the parties had a similar

2    business-development relationship governed by a confidentiality agreement. *Alta Devices, Inc. v. LG*

3    *Elecs., Inc.* 343 F. Supp. 3d 868, 882 (N.D. Cal. 2018).[36] Alta had developed "a production line of

4    thin-film GaAs solar cells." *Id.* at 873. It entered into a nondisclosure agreement with LG, which had

5    not developed the technology, so that LG could decide whether to invest in Alta or engage in "other

6    business opportunities related to Alta's technology." *Id.* LG visited Alta's headquarters, where it

7    obtained confidential information. *Id.* at 873–74. Then, LG "began to plan how to develop" the same

8    technology, sought and obtained "further detailed information about the techniques and processes

9    involved in the actual manufacturing of the solar film," and ultimately "declined to make binding its

10   previous tentative investment offer. *Id.* at 785. Thereafter, LG developed its manufacturing

11   capabilities using Alta's confidential information and began making similar solar film. *Id.*

12   At issue was whether Alta identified its trade secrets sufficiently in its complaint. It identified

13   the technology at issue (the thin-film GaAs solar technology), and it also identified its confidential

14   information (its methods of "high throughput thin-film deposition; epitaxial lift-off of the thin-

15   film; and GaAs substrate maintenance and re-use," its "confidential cost analysis," "proofs and

16   tests of manufacturing concepts and techniques," tool roadmaps, manufacturing process flows, and

17   identification of equipment and equipment vendors). *Id.* at 881. An appendix to the agreement

18   gave more information about why the information was confidential, broken into categories (e.g.,

19   CVD technology and its commercial viability) and bullet points to illustrate the categories (e.g.,

20   CVD chamber scheme, growth rate, thin-film quality, utilization, gas-utilization efficiency,

21   scalability, and short-term feasibility). *Id.*

22   The *Alta* court held that Alta alleged its trade secrets with sufficient particularity, in part

23   because Alta's claims were based on confidential information exchanged under the non-disclosure

24   agreement. LG could "hardly claim that it was unable to determine what trade secrets" Alta gave

25   to it under the agreement. *Id.* at 881–82 (cleaned up).

26

27

---

28   [36] *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The *Alta* court also cited *TMX Funding* as a similar case. *Id.* at 883 (citing *TMX Funding, Inc. v.*

2    *Impero Tech., Inc.*, No. C 10-00202 JF (PVT), 2010 WL 2509979, at *3 (N.D. Cal. June 17, 2010)).

3    *TMX* involved departing employees' alleged theft of trade secrets, identified as software, source code,

4    data, formulas, business methods, marketing plans ("such as prospective customer and sales methods

5    for attracting and retaining customers"), and product information such as cost, pricing, margin data,

6    and other financial information). The *TMX* court held that these designations were sufficient. *Id.*

7    (quoting *TMX*, 2010 WL 2509979, at *3); *TMX*, 2010 WL 2509979, at *1, *3. Applying *TMX* (and

8    other cases), the *Alta* court concluded that Alta's allegations gave LG "notice of the boundaries

9    within which the trade secrets lie." *Alta*, 343 F. Supp. 3d at 882.

10    When parties have a relationship through a confidentiality agreement, as they did in *Alta* and

11    in this case, they have more information about the alleged confidential and trade-secret

12    information. The designations here are not as specific as in *Alta*, but they are analogous, and they

13    are close to those in *TMX*. Given STEMCELL's general arguments untethered to any case

14    analysis, StemExpress's designations sufficiently define the boundaries of discovery.

15    Second, StemExpress does not need to prove confidentiality in its § 2019.210 designations.

16    *Perlan*, 178 Cal. App. 4th at 1351 (A plaintiff "is *not* required to convince defendants or the court in

17    its section 2019.210 statement that its alleged trade secrets are not generally known to the public.").

18    Instead, it must "identify the alleged trade secret with adequate detail to allow the defendant to

19    investigate how it might differ from matters already known and to allow the court to craft relevant

20    discovery." *Brescia*, 172 Cal. App. 4th at 147; *E. & J. Gallo Winery v. Instituut Voor Landbouw–En*

21    *Visserijonderzoek*, No. 1:17-cv-00808-DAD-EPG, 2018 WL 2463869, at *6 (E.D. Cal. June 1,

22    2018) (when a complaint plausibly alleges trade secrets, the issue of whether the trade secrets have

23    been publicly disclosed is "properly the subject of discovery," and "[t]his sort of review is more

24    appropriate on a motion for summary judgment"). Similarly, "the trade secret claimant need not

25    particularize how the alleged secret differs from matters already known to skilled persons in the

26    field." *Brescia*, 172 Cal. App. 4th at 143.

27    In sum, on this record and argument, the designations (except for designation 11) are sufficiently

28    particular. The court previously denied the motion to quash the third-party subpoenas, in part because

United States District Court
Northern District of California

they sought public-record information.[37] The sufficiency of the designations now means that

discovery can go forward.

### CONCLUSION

The court strikes designation 11 but otherwise denies STEMCELL's motion to strike the trade-

secret designations and stay discovery. This disposes of ECF No. 74.

**IT IS SO ORDERED.**

Dated: February 24, 2022



_____
LAUREL BEELER
United States Magistrate Judge

---

[37] Order – ECF No. 68.