# EXHIBIT A

Port J. Parker, SBN 179256
port@parlawgroup.com
Myles G. Taylor, SBN 298687
myles@parlawgroup.com
**PARKER TAYLOR LAW GROUP, PC**
555 Capitol Mall, Suite 1230
Sacramento, CA 95814
Telephone: (916) 996-0400

Attorneys for Defendants STEMEXPRESS, LLC and CATE DYER

parker taylor law group

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEMCELL TECHNOLOGIES CANADA INC., f/k/a STEMCELL TECHNOLOGIES INC., a Canadian corporation; STEMCELL TECHNOLOGIES INC., a Nevada corporation; and CANVENTA LIFE SCIENCES, INC., a Delaware corporation,<br><br>Plaintiffs,<br>v.<br><br>STEMEXPRESS, LLC, a California limited liability corporation; CATHERINE S. DYER a/k/a CATE DYER, an individual; and DOES 1-10 inclusive,<br><br>Defendants.<br>---<br>STEMEXPRESS, LLC, a California limited liability corporation;<br><br>Counter-Plaintiff<br><br>v.<br><br>STEMCELL TECHNOLOGIES CANADA INC., et. al.<br><br>Counter-Defendants. | Case No. 3:21-cv-01594<br><br>*Case Assigned to Judge Vince Chhabria*<br><br>**STEMEXPRESS, LLC'S AMENDED RESPONSES TO STEMCELL TECHNOLOGIES CANADA, INC.'S FIRST SET OF INTERROGATORIES** |

PROPOUNDING PARTY: Plaintiff STEMCELL TECHNOLOGIES CANADA, INC.

RESPONDING PARTY: Defendant STEMEXPRESS, LLC

SET NUMBER: One (Amended)

**GENERAL OBJECTIONS**

1. The following responses are based on discovery available as of the date hereof. These responses are given without prejudice to Responding Party 's right to produce or rely on subsequently discovered information.

2. Responding Party objects to the scope of the definition of REFER TO" or "RELATE TO" as overbroad and unduly burdensome, including as to the definitions being both self-referential and also seeking subjective understanding such as "evidencing" and requiring the terms be apply "as the context makes appropriate."

3. Nothing herein is intended to be or should be construed as a waiver of the attorney-client privilege, the work product doctrine, or any other protection. Inadvertent production of such protected information is not intended to be and shall not operate as a waiver of the applicable privilege. Any responsive information specifically withheld based on such privilege will be identified on a privilege log, except to the extent that such privilege arises from the attorney-client relationship between counsel of record and Defendants, which are privileged by their nature.

4. Responding Party objects to the requests to the extent that they would require Responding Party to produce information covered by confidentiality agreements with others, or that would require Responding Party to violate the privacy interests of others.

5. Responding Party is continuing to analyze, review, and evaluate this case, and discovery is continuing. Responding reserves the right to amend or supplement its responses and production based thereon.

**RESPONSES TO INTERROGATORIES, SET ONE**

**INTERROGATORY NO. 1:**

As to each of YOUR trade secrets allegedly used or disclosed by any Cross- or Counter-Defendant, identify the trade secret with sufficient specificity to distinguish it from information in the public domain, including without limitation information known to the public, information known to competitors, information disclosed in patents or published patent applications, information disclosed in research papers or at professional conferences, and information that would be easily ascertainable by persons ordinarily skilled in the art.

parker taylor law group

**AMENDED RESPONSE TO INTERROGATORY NO. 1:**

Responding Party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1), as Responding Party has already identified its trade secrets at issue in the case. Responding Party incorporates by reference the trade secret disclosure issued in this case. Similarly, Responding Party objects that this request seeks information can be obtained from a more convenient source, Responding Party's trade secret identification which is already in Propounding Party's possession. Responding Party objects that this interrogatory is overbroad and compound.

Subject to objections, Responding Party responds:

1. StemExpress' method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool based on considerations of demographic and health information of the donor and StemExpress' eligibility, exclusion and deferral criteria.

The value of StemExpress' trade secret of its method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool based on considerations of demographic and health information of the donor and StemExpress' eligibility, exclusion, and deferral criteria, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods, techniques, and processes for screening potential biospecimen donors for inclusion within its donor pool based on considerations of demographic and health information of the donor as well as StemExpress' own eligibility, exclusion, and deferral criteria. These processes and procedures as well as the modifications and improvements on them are

recorded in StemExpress' standard operating procedures. These documents describe processes including intake and screening of donors; the prescreening procedures StemExpress implemented for donors; insights as to the characteristics of donors whose donations produce higher quality primary cells; best practices for searching the database for donors that meet specific customer criteria. These procedures were each customized to serve a business that manufactures primary cells. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool based on considerations of demographic and health information of the donor and StemExpress' eligibility, exclusion, and deferral criteria and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

2. StemExpress' method, technique, and process for scheduling donors for collections of biospecimen samples, including factors of frequency and types of collections to maximize cell viability and optimize collection process and capacity.

The value of StemExpress' trade secret of its method, technique, and process for scheduling donors for collections of biospecimen samples including factors of frequency and types of collections to maximize cell viability and optimize collection process and capacity, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014).

parker taylor law group

StemExpress' method, technique, and process for scheduling donors for collections of biospecimen samples was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods, techniques, and processes for scheduling donors for collections of biospecimen samples. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures regarding scheduling of donors for collections of biospecimen samples including deferral times for donors for optimal draws; procedures for scheduling donors particularly with respect to scheduling them for different types of draws and managing the donors' schedule with customer requests for specific donor specifications; rules for scheduling donors based on their attendance history to improve the likelihood that a donor will appear as scheduled and no lab slots will be wasted; best practices for searching the database for donors that meet specific customer criteria rules for scheduling donors based on their attendance history to improve the likelihood that a donor will appear as scheduled and no lab slots will be wasted; and customizing software and computer programs to most effectively assist the scheduling process. These procedures were each customized to serve a business that manufactures primary cells. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for scheduling donors for collections of biospecimen samples, including factors of frequency and types of collections to maximize cell viability and optimize collection process and capacity, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

3. StemExpress' batch records for leukopak products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time



parker taylor law group

to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for leukopak products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create its own batch records for leukopak products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing leukopak products to specification. The step-by-step instructions on the batch records explain in detail how to perform the validation of the leukopak including the amount of the sample to be tested, the types of tubes used, when to add buffers and how much to add, the type of equipment to use; and the temperature components should be stored at. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a

parker taylor law group

confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

4. StemExpress' batch records for mobilized leukopak products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for mobilized leukopak products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for mobilized leukopak products which contain the proprietary step-by-step instructions for processing biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for mobilized leukopak products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing mobilized leukopak products to specification. The step-by-step

parker taylor law group

instructions on the batch records explain in detail how to the order of the steps, the duration of each step, pre-processing analysis, the quantities each ingredient, the method of using the centrifuge, the wash statistics. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

5. StemExpress' batch records for cord blood products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for cord blood products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for cord blood products which contain the proprietary step-by-step instructions for processing biospecimen samples and manufacturing to specification was included in



parker taylor law group

parker taylor law group

the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for cord blood products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing to specification. The step-by-step instructions on the batch records explain in detail how to perform the infectious disease testing; pre-processing analysis; whole cord blood processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the cells; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

6. StemExpress' batch records for bone marrow products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for bone marrow products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved

and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for bone marrow products which contain the proprietary step-by-step instructions for processing biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for bone marrow products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing to specification. The step-by-step instructions on the batch records explain in detail how to manufacture the bone marrow products including pre-processing analysis; whole bone marrow processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the cells and the settings on the centrifuge; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to

specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

7. StemExpress' batch records for custom biospecimen sample products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for custom biospecimen sample products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for custom biospecimen sample products which contain the proprietary step-by-step instructions for processing these biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for custom biospecimen sample products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing to specification. The step-by-step instructions on the batch records explain in detail how to manufacture the custom products including pre-processing analysis; processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the



parker taylor law group

cells and the settings on the centrifuge; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

8. StemExpress' method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for transferring, preserving, storing and handling of biospecimen from collection to manufacturing in the laboratory.

The value of StemExpress' trade secret of its method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for transferring, preserving, storing and handling of biospecimen from collection to manufacturing in the laboratory, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for

transferring, preserving, storing, and handling of biospecimen from collection to manufacturing in the laboratory was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods and techniques of designing and configuring its biospecimen collection center and laboratory. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for transferring, preserving, storing and handling of biospecimen from collection to manufacturing in the laboratory. This information was also obtained by Stemcell during its audits of Stemcell's Folsom, CA and Boston, MA locations. The frequency of these audits increased as the end of the first term of the Supply Agreement neared. This information as a whole is not and has never been publicly available. It has been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method and technique of designing and configuring its biospecimen collection center and laboratory, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

9. StemExpress' method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific selection and use of equipment, as developed by StemExpress and improved and modified over time.

The value of StemExpress' trade secret of its method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific selection and use of equipment, as developed by StemExpress and modified over time, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade

secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific selection and use of equipment, as developed by StemExpress and modified over time, was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods, techniques, and processes for freezing products to maximize efficiency and cost effectiveness. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific selection and use of equipment, as developed by StemExpress and modified over time. The step-by-step instructions on the batch records explain in detail how to freeze each product including how to distribute the sample over multiple vials for cryopreservation; the method of pelleting the samples in the vials; the amount of the sample to place in each vial, and the type of vials used; and the type of freezer and the temperature of that freezer to store the samples at; and how long the vials can be in the freezer before they should be transferred to the shipping freezing medium. This information as a whole is not and has never been publicly available. It has been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for freezing products to maximize efficiency and cost effectiveness, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

/ / /

parker taylor law group

10. StemExpress' method, technique, and process for manufacturing off-catalogue custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies.

The value of StemExpress' trade secret of its method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies. The step-by-step instructions on the batch records explain in detail how to manufacture the custom products including pre-processing analysis; processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the cells and the settings on the centrifuge; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It has been disclosed only to those StemExpress employees with a need to know, to select consultants, and

to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

**INTERROGATORY NO. 2:**

As to each trade secret referred to in response to Interrogatory 1, describe it with sufficient particularity to separate it from matters of general knowledge in the trade and of special knowledge of persons skilled in the trade.

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Responding party objects that this interrogatory is essentially duplicative of interrogatory 1 in that identification of a trade secret with sufficient particularity to set it apart from information in the public domain is effectively the same as describing said trade secret with sufficient particularity to separate it from general knowledge of persons skilled in the trade. Responding Party further objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1), as Responding Party has already identified its trade secrets at issue in the case. Responding Party incorporates by reference the trade secret disclosure issued in this case. Similarly, Responding Party objects that this request seeks information can be obtained from a more convenient source, Responding Party's trade secret identification which is already in Propounding Party's possession. Responding Party objects that this interrogatory is overbroad and compound.

Subject to objections, Responding Party responds:

1. StemExpress' method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool based on considerations of demographic and health information of the donor and StemExpress' eligibility, exclusion and deferral criteria.

/ / /

The value of StemExpress' trade secret of its method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool based on considerations of demographic and health information of the donor and StemExpress' eligibility, exclusion, and deferral criteria, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods, techniques, and processes for screening potential biospecimen donors for inclusion within its donor pool based on considerations of demographic and health information of the donor as well as StemExpress' own eligibility, exclusion, and deferral criteria. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures. These documents describe processes including intake and screening of donors; the prescreening procedures StemExpress implemented for donors; insights as to the characteristics of donors whose donations produce higher quality primary cells; best practices for searching the database for donors that meet specific customer criteria. These procedures were each customized to serve a business that manufactures primary cells. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for screening potential biospecimen donors for inclusion within its donor pool



parker taylor law group

based on considerations of demographic and health information of the donor and StemExpress' eligibility, exclusion, and deferral criteria and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

2. StemExpress' method, technique, and process for scheduling donors for collections of biospecimen samples, including factors of frequency and types of collections to maximize cell viability and optimize collection process and capacity.

The value of StemExpress' trade secret of its method, technique, and process for scheduling donors for collections of biospecimen samples including factors of frequency and types of collections to maximize cell viability and optimize collection process and capacity, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method, technique, and process for scheduling donors for collections of biospecimen samples was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods, techniques, and processes for scheduling donors for collections of biospecimen samples. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures regarding scheduling of donors for collections of biospecimen samples including deferral times for donors for optimal draws; procedures for scheduling donors particularly with respect to scheduling them for different types of draws and managing the donors' schedule with customer requests for specific donor specifications; rules for scheduling donors based on their attendance history to improve the likelihood that a donor will appear as scheduled and no lab slots will be wasted; best practices for searching the database for donors that meet specific customer criteria rules for scheduling donors based on their attendance history to improve the likelihood that a donor



parker taylor law group

will appear as scheduled and no lab slots will be wasted; and customizing software and computer programs to most effectively assist the scheduling process. These procedures were each customized to serve a business that manufactures primary cells. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for scheduling donors for collections of biospecimen samples, including factors of frequency and types of collections to maximize cell viability and optimize collection process and capacity, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

3. StemExpress' batch records for leukopak products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for leukopak products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for leukopak products which contain the proprietary step-by-step



parker taylor law group

instructions for processing biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create its own batch records for leukopak products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing leukopak products to specification. The step-by-step instructions on the batch records explain in detail how to perform the validation of the leukopak including the amount of the sample to be tested, the types of tubes used, when to add buffers and how much to add, the type of equipment to use; and the temperature components should be stored at. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

4. StemExpress' batch records for mobilized leukopak products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for mobilized leukopak products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved

and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for mobilized leukopak products which contain the proprietary step-by-step instructions for processing biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for mobilized leukopak products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing mobilized leukopak products to specification. The step-by-step instructions on the batch records explain in detail how to the order of the steps, the duration of each step, pre-processing analysis, the quantities each ingredient, the method of using the centrifuge, the wash statistics. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.



parker taylor law group

5. StemExpress' batch records for cord blood products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for cord blood products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for cord blood products which contain the proprietary step-by-step instructions for processing biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for cord blood products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing to specification. The step-by-step instructions on the batch records explain in detail how to perform the infectious disease testing; pre-processing analysis; whole cord blood processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the cells; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It had been disclosed only to

parker taylor law group

those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

6. StemExpress' batch records for bone marrow products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for bone marrow products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for bone marrow products which contain the proprietary step-by-step instructions for processing biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for bone marrow products, which contain the proprietary step-by-step instructions for processing the

parker taylor law group

biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing to specification. The step-by-step instructions on the batch records explain in detail how to manufacture the bone marrow products including pre-processing analysis; whole bone marrow processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the cells and the settings on the centrifuge; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

7. StemExpress' batch records for custom biospecimen sample products under the Supply Agreement, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability.

The value of StemExpress' trade secret of its batch records for custom biospecimen sample products under the Supply Agreement, which contain proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, as developed by StemExpress and improved and modified over time to improve efficiency and viability, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and



parker taylor law group

processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' batch records for custom biospecimen sample products which contain the proprietary step-by-step instructions for processing these biospecimen samples and manufacturing to specification was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available processes to create batch records for custom biospecimen sample products, which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the step-by-step instructions for processing biospecimen samples and manufacturing to specification. The step-by-step instructions on the batch records explain in detail how to manufacture the custom products including pre-processing analysis; processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the cells and the settings on the centrifuge; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It had been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' batch records for leukopak products which contain the proprietary step-by-step instructions for processing the biospecimen samples and manufacturing to specification, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

8. StemExpress' method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for transferring, preserving, storing and handling of biospecimen from collection to manufacturing in the laboratory.

The value of StemExpress' trade secret of its method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for transferring, preserving, storing and handling of biospecimen from collection to manufacturing in the laboratory, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for transferring, preserving, storing, and handling of biospecimen from collection to manufacturing in the laboratory was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods and techniques of designing and configuring its biospecimen collection center and laboratory. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the method and technique of designing and configuring its biospecimen collection center and laboratory, including type, arrangement, and quantity of equipment used and methods for transferring, preserving, storing and handling of biospecimen from collection to manufacturing in the laboratory. This information was also obtained by Stemcell during its audits of Stemcell's Folsom, CA and Boston, MA locations. The frequency of these audits increased as the end of the first term of the Supply Agreement neared. This information as a whole is not and has never been publicly available. It has been disclosed only to those



parker taylor law group

StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method and technique of designing and configuring its biospecimen collection center and laboratory, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

9. StemExpress' method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific selection and use of equipment, as developed by StemExpress and improved and modified over time.

The value of StemExpress' trade secret of its method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific selection and use of equipment, as developed by StemExpress and modified over time, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific selection and use of equipment, as developed by StemExpress and modified over time, was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available methods, techniques, and processes for freezing products to maximize efficiency and cost effectiveness. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the method, technique, and process for freezing products to maximize efficiency and cost effectiveness, including specific



parker taylor law group

selection and use of equipment, as developed by StemExpress and modified over time. The step-by-step instructions on the batch records explain in detail how to freeze each product including how to distribute the sample over multiple vials for cryopreservation; the method of pelleting the samples in the vials; the amount of the sample to place in each vial, and the type of vials used; and the type of freezer and the temperature of that freezer to store the samples at; and how long the vials can be in the freezer before they should be transferred to the shipping freezing medium. This information as a whole is not and has never been publicly available. It has been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for freezing products to maximize efficiency and cost effectiveness, and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

10. StemExpress' method, technique, and process for manufacturing off-catalogue custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies.

The value of StemExpress' trade secret of its method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies, includes methods, techniques, and processes, portions of which may be publicly available, but which are not as a whole publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). StemExpress' method, technique, and process for manufacturing off-catalog custom isolated biospecimen products,



parker taylor law group

requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies was included in the scope of StemExpress' trade secrets as defined in the parties' Supply Agreement. Over time, StemExpress developed and modified publicly available method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records containing the method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies. The step-by-step instructions on the batch records explain in detail how to manufacture the custom products including pre-processing analysis; processing including the temperature of reagents, the temperature, rotations, and time to run the centrifuge as well as the number of times to centrifuge the cells and the settings on the centrifuge; the processes to follow in between each time the cells are centrifuged; and the post-production testing and validation processes. This information as a whole is not and has never been publicly available. It has been disclosed only to those StemExpress employees with a need to know, to select consultants, and to business partners of StemExpress, but each of these disclosures was pursuant to a nondisclosure agreement. Counter-Defendants wanted to access and use this information, which is StemExpress' trade secret. Therefore, Counter-Defendants used the access they had through their business relationship with StemExpress, which was governed by a confidentiality agreement, to misappropriate StemExpress' method, technique, and process for manufacturing off-catalog custom isolated biospecimen products, requiring specialized vial sizes, anticoagulant usage, and custom manufactured collection supplies and used it at Canventa to create an efficient and profitable cell manufacturing business without having to develop or discover this method, technique and process on its own.

**<u>INTERROGATORY NO. 3:</u>**

As to each trade secret identified in response to Interrogatory No. 1, separately describe all measures YOU have taken to protect its secrecy.

/ / /

/ / /

parker taylor law group

**AMENDED RESPONSE TO INTERROGATORY NO. 3:**

Responding party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1), as "describe all measures" taken by Responding Party to protect each of its trade secrets would require the extreme burden of listing every non-disclosure agreement it has ever entered into with any employee, independent contractor, supplier, customers, or any other person. Further, a full and complete response to this interrogatory would also require the listing of numerous measures taken to secure its trade secret information as to each individual or entity which has ever obtained any such information from Responding Party.

Subject to objections, Responding Party responds: StemExpress takes significant steps to maintain the secrecy of its confidential information and as well as each of the trade secrets listed in response to Interrogatory No. 1. StemExpress employees the following measures to protect each of the trade secrets described in response to Interrogatory No. 1. These measures include, but are not limited to: (a) emphasizing to consultants and employees StemExpress' need to keep this information a secret, as well as customers, partners, and vendors that become privy to the same; (b) requiring, as a condition of entering into a contractual relationship with StemExpress or receiving any confidential information, that a party is bound by duties and obligations of confidentiality; (c) limiting access and/or restricting access to this information on a need-to-know basis, both internally and externally; and (d) implementing significant physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on StemExpress' computer system, servers, and networks, and requiring that confidential information be kept in secure locations. On site, StemExpress uses visitor check in and badges for non-employees at its facilities, has locked doors separating portions of its physical space, and uses keycards to gain access. In addition, StemExpress employees are required to sign an Employee Handbook and a Non-Disclosure/Proprietary Information and Inventions Assignment with the company, all of which include terms requiring the employee comply with confidentiality terms. Company information is restricted to certain employment levels and departments, with only a few select individuals at the company having access to certain records, such as the stored batch records. StemExpress has conducted training, notices, exit interviews, and other activities to emphasize the

parker taylor law group

need for confidentiality internally. StemExpress requires nondisclosure agreements with respect to any company or individual with which it does or intends to do business with prior to exchange of its confidential information. Each of the above described measures to ensure confidentiality is taken with respect to each of the trade secrets listed in response to Interrogatory No. 1.

**INTERROGATORY NO. 4:**

As to each trade secret identified in response to Interrogatory No. 1, separately identify each person or entity to whom or to which YOU have disclosed it, whether or not the disclosure was made pursuant to a confidentiality or non-disclosure agreement.

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Responding party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). This interrogatory seeks the identification of each person or entity to whom Responding Party has disclosed its trade secret information since Responding Party's inception in 2010.

Subject to objections, Responding Party responds: Responding Party utilizes a share drive for employees to access StemExpress' files containing confidential information and trade secrets. This share drive requires strict user permissions so that employees can only access the files that they have a need to access based on their particular job role or department. StemExpress maintains a separation of duties across the company.

The outside consultants with whom StemExpress has contracted are Joe Anderson and Sharlie Barclay. Third parties with whom StemExpress contracts, including consultants, are required to sign a nondisclosure agreement if they are provided access to any of StemExpress' confidential information or trade secrets. Additionally, all employees and outside consultants are required to sign nondisclosure agreements with respect to confidential information and trade secrets they are given access to. Every onsite visitor to StemExpress is required to sign a nondisclosure agreement pertaining to StemExpress' confidential information and its trade secrets.

**INTERROGATORY NO. 5:**

As to each trade secret identified in response to Interrogatory No. 1, explain how it derives independent economic value from not being known to the public or others who can derive a financial

parker taylor law group

benefit from using it.

**AMENDED RESPONSE TO INTERROGATORY NO. 5:**

Responding party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1), as the burden for Responding Party to explain the financial benefit of each trade secret remaining secret is extremely high and will require the use of expert analysis.

Subject to objections, Responding Party responds: The value of each of StemExpress' trade secrets identified in response to Interrogatory No. 1 stem from the fact that the processes, methods, and techniques identified as trade secrets are not and have not been in the public domain. Portions of these processes, methods, and techniques may be publicly available, but as a whole they are not publicly known. The integration and compilation of these methods, techniques, and processes is a protectable trade secret. "A trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal.App.4th, 26, 48 (2014). The independent economic value of the enumerated trade secrets is further evidenced by the fact that they were protected under the parties' Supply Agreement and the fact that Plaintiffs were willing to enter this agreement restricting their use of StemExpress' confidential information and trade secrets in order to have access to that confidential information and trade secrets. Over time, StemExpress has developed and modified publicly available processes to create these methods, techniques, and processes. These processes and procedures as well as the modifications and improvements on them are recorded in StemExpress' standard operating procedures and batch records, which have been protected by nondisclosure agreements and restricting the number of people who have access to these documents. The information identified in response to Interrogatory No. 1, as a whole, is not and has never been publicly available. The independent economic value of the trade secrets identified in Interrogatory No. 1 is further evidenced by the fact that Counter-Defendants wanted to access and use this information that was not publicly available and subsequently used it with the formation and operation of Canventa to create an efficient and profitable cell manufacturing

parker taylor law group

business without having to develop or discover this method, technique and process on its own, which allowed Counter-Defendants to gain efficiency, avoid expenses that would have otherwise been required to obtain the information made available to Stemcell Technologies under the Supply Agreement.

**INTERROGATORY NO. 6:**

As to each trade secret identified in response to Interrogatory No. 1, state as to each Cross-Defendant all facts that show or tend to show the Cross-Defendant has used that trade secret.

**AMENDED RESPONSE TO INTERROGATORY NO. 6:**

Responding Party objects on the basis of attorney-client and attorney work product privileges to the extent that communications between Responding Party or their work-product, could be considered responsive. Responding party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1), is overbroad, and too burdensome to answer. This interrogatory seeks all facts associated with every trade secret misappropriation made by Propounding Party since the inception of the business relationship between the parties in 2012. This is incredibly broad and burdensome. Responding Party directs Propounding Party to its own records to show it has used each of Responding Party's trade secrets, as this information can be obtained from a more convenient, less burdensome, or less expensive source, namely, itself.

Subject to objections, Responding Party responds:

As part of the negotiation process regarding a potential supply agreement, STEMCELL acknowledged StemExpress was an expert in its fields. STEMCELL proposed terms by which it would have the option to purchase StemExpress once it reached a certain level of profitability. StemExpress rejected that from being included in a deal. StemExpress is informed and believes that Counter-Defendants ultimately formed a plan and acted upon a plan to misappropriate and misuse StemExpress' confidential information and trade secrets to form a knockoff of StemExpress' manufacturing business, Canventa, because such terms were turned down. This plan included accessing, learning, appropriating and ultimately misusing StemExpress' confidential information and trade secrets.

/ / /

parker taylor law group

At the time STEMCELL entered into the Confidentiality Agreement and the Supply Agreement with StemExpress, StemExpress is informed and believes that STEMCELL did not possess independent knowledge, skill, or information relating to procure blood and bone marrow collection or manufacture primary cell isolation products. In other words, StemExpress was *the* procurer and manufacturer. Because STEMCELL did not have independent know-how, methods, techniques, or knowledge to operate blood and bone marrow procurement collection centers or manufacture the primary cell products that StemExpress offered, STEMCELL sought to purchase products from StemExpress.

Indeed, senior representatives and management at STEMCELL, including those who are overseen by or report to Allen Eaves, made comments to StemExpress, including Dyer, that StemExpress was and are the "experts" in those fields and that STEMCELL relied on StemExpress' expertise. Other STEMCELL representatives made similar statements to StemExpress following the formation of the agreement.

Prior to the term of the Confidentiality Agreement and the Supply Agreement with StemExpress, StemExpress is informed and believes that Counter-Defendants did not operate any facilities for collection of biological material or laboratory facilities for the isolation and manufacture of such biospecimen products. Indeed, even the Supply Agreement provides that STEMCELL anticipated only carrying out internal research and development for purposes of developing STEMCELL other products, such as kits and assays.

The Supply Agreement further provided that, while "STEMCELL may purchase from [StemExpress], Products for its internal use and for its educational program", the agreement also stated that "STEMCELL represents and warrants that at the time of signing this Agreement it does not use any other supplier for frozen products that STEMCELL resells and that are the same or similar to the Products listed in Appendix B. If STEMCELL makes a decision to resell products made by a third party other than Supplier that are the same or similar to Products listed in Appendix B, it shall notify Supplier in advance." (Sections 2.2 and 2.3.) StemExpress is informed and believes that, rather than continue to obtain products from another third-party supplier, Counter-Defendants, at the direction of Eaves, conspired and schemed to become its own supplier through breach, theft and misappropriation



parker taylor law group

of StemExpress' confidential information and trade secrets.

The initial term of the Supply Agreement terminated as of May 1, 2019, with an automatic renewal for an additional three years. Either party could elect to terminate, providing at least twelve months' notice prior to the end of the term.

On April 26, 2018, StemExpress provided STEMCELL with a notice of intent not to renew and requested renegotiations of the Supply Agreement terms.

From 2018 to early 2019, STEMCELL purported to negotiate renewal contract terms, and by the end of the process, the parties appeared close to reaching an agreement. During this time, StemExpress continued to supply STEMCELL with products and respond to requests for audits and requests about StemExpress' know-how, processes, procedures, techniques, systems and information under the Supply Agreement.

On April 1, 2019, STEMCELL abruptly ending negotiations with StemExpress for a renewed agreement.

On multiple occasions from 2013 to 2018, STEMCELL performed "quality audits" of StemExpress. These audits involved extensive access to StemExpress, including confidential information and trade secrets in connection with its procurement and donor collections, the laboratory manufacturing operations and business plans. STEMCELL then produced confidential audit reports using StemExpress' information. The quality audit reports contain discussions of StemExpress' confidential procurement and manufacture processes and were derived from STEMCELL access to the same.

StemExpress is informed and believes that Counter-Defendants and their agents and employees, including Allen Eaves, planned, schemed and conspired amongst themselves to gain access to StemExpress' confidential procurement and manufacturing operations, information and trade secrets with the concealed intent to misappropriate the same.

STEMCELL obtained this confidential information through three primary methods: (1) quality control audits, (2) direct employee requests, and (3) communications amongst the respective executives and managers, including during regular meetings.

/ / /

For quality control audits, StemExpress made available to SCT troves of confidential procurement and manufacturing information relating to its know-how, processes, procedures, and techniques. StemExpress made this information available pursuant to protections provided in Supply Agreement.

STEMCELL's audit agendas identified various categories of procurement and manufacturing information that it sought to review, which contained StemExpress information that STEMCELL acknowledged was confidential. After its on-site tour and review of StemExpress documents, STEMCELL would prepare a Quality Audit Report. STEMCELL's audit reports addressed specific confidential information about the company, namely know-how, processes, procedures, and techniques StemExpress used. The audit reports included separate sections to discuss the following topics, each of which is confidential information as defined by the parties' agreement:

- "Company Background Summary" (including referencing StemExpress' "evaluat[ion of] other cities to potentially add new donor site to expand on their donor source[s]…")
- "Donor Collection and Donor Consent" (including detailed lists of the internal processes for initial donor screening; how StemExpress assesses, selects, and manages its donor pools; the frequency of re-testing, re-screening, and repeat donation to achieve optimal blood draws)
- "Manufacturing, Batch Records and Quality Control" (including highly confidential trade secrets contained within StemExpress' batch records for the products under the agreement, discussed further below).
- "Logistics and Material Management" (including step-by-step protocol for receiving and handling samples and shipping processes, such as where, how, and how long product is stored, types of optimal packaging materials and counts).
- "Specifications and Certificates of Analysis" (including process for obtaining the figures for the certificate, generating the certificate, and verifying accuracy).
- "Equipment" (including StemExpress' selection of equipment for purposes of what was "more efficient and cost effective").
- "Other Quality System" (including internal processes for completing manufacturing, tracking activity, and improving workflow).

The information contained in the Quality Audit Reports, and importantly the information that STEMCELL accessed as part of the audits, constitutes confidential procurement, manufacturing, and business information of StemExpress that is not generally known to the public. StemExpress had invested years of time and resources into developing and improving their procurement and manufacturing processes for the products it sold to STEMCELL under the Supply Agreement. StemExpress also compiled its information, learned through trial and error, which it used to more cost effectively and efficiently procure and manufacture its products. STEMCELL acknowledges the value of this information when, for example, its own reports had commented on StemExpress' improvements and StemExpress' reasoning for choosing one piece of equipment or manner of completing a task in the manufacturing process, over another available one, due to efficiency and cost effectiveness that StemExpress has worked out over time.

StemExpress created and documented its confidential procurement and manufacturing processes in its standard operating procedures ("SOPs") and batch records, also known as laboratory protocols ("batch records"). During the Supply Agreement, StemExpress made certain SOPs and batch records available to STEMCELL.

In addition to the audits, STEMCELL's employees submitted direct requests for confidential procurement or manufacturing information. Between just 2016 and 2019, SCT made over 50 requests for information by email. These requests sought details about donor selection, cell counting processes, equipment selection for manufacturing, processes for analyzing samples, how to draw multiple cell types from the same donor, freezing procedures, and reagent and media uses.

In addition to the direct requests, SCT and StemExpress held regular meetings between its personnel in connection with the Supply Agreement relationship. In such meetings, personnel discussed StemExpress confidential procurement and manufacturing operations or processes, similar to the topics and information as those raised as part of the quality audit and direct requests.

StemExpress is informed and believes that Counter-Defendants, with the knowledge, support, consent and/or ratification of Eaves or other STEMCELL Representatives, have misused, exploited, disclosed or appropriated, in violation and breach of the Agreement between the parties, StemExpress' confidential procurement and manufacturing SOPs, including the confidential information for:

parker taylor law group

A. Consenting Donors (namely, the internal procedures developed to efficiently identify, screen, schedule, and handle donor issues).
B. Quality Control Test Methods (namely, the quality control test methods used to procedure and isolate finished products to ensure consistent validation of finished products and equipment used).
C. Stability Management (namely, the internal know-how and procedures for collection, storage, and analysis of stability samples of finished products).
D. Batch Record Verification and Review (namely, the internal know-how and procedures for using batch records for isolation in laboratory and the two-tier process for ensuring verification).
E. Cell Isolate Quality Control (namely, the internal process for using a representative sample to test specific standards against a sample from a cell preparation).
F. Quality Management (namely, quality methods used to satisfy customer requirements and improve management, used to direct employees through various requirements of the ISO standards).

STEMCELL knew that StemExpress created, modified, and used its methods, techniques, and processes for both procurement and manufacturing activities. StemExpress developed its confidential procurement and manufacturing processes over time and using considerable ongoing resources, and which allow for StemExpress to manufacture its products competitively, efficiently and cost-effectively.

StemExpress maintains confidential batch records for procurement and manufacturing of each of its products, which provides it's step by step process for the procurement, manufacturing and shipment of their products. The batch records acted as an internal guide, with detailed, step-by-step procedures, for StemExpress procurement and manufacturing operations. StemExpress' batch records contain specific know-how for procuring the biospecimen and then manufacturing StemExpress' products sold under the Supply Agreement, beyond that of the generalized knowledge available to those outside of the company. This includes not only the procedures themselves, but also the timing, materials used, quantity of materials used, equipment calibrations, and other specific information therein that StemExpress had an has continued to improve upon over time. The batch records contain specific revision histories and dates to show who modified, what was modified, and when it was modified. StemExpress has developed its batch records such that an employee with sufficient basic scientific knowledge and laboratory training can repeatedly and efficiently create the products. In



parker taylor law group

other words, StemExpress' batch records constitute the recipe books for its procurement and manufacturing.

STEMCELL accessed versions of StemExpress' SOPs and batch records during and under the Supply Agreement. StemExpress alleges the confidential information contained within its SOPs and batch records, as they relate to StemExpress' procurement/donor collection activity and manufacturing/laboratory processes for producing the products under the Supply Agreement and the interrelationship between these two aspects of the business, are trade secrets under Cal. Civil Code § 3426.1(d).

StemExpress is informed and believes that during the five-year Supply Agreement, STEMCELL planned to systematically obtain as much confidential information about StemExpress procurement and interrelated manufacturing operations as possible, with the intent to misappropriate, misuse, exploit, or disclose that information in order to form and operate Canventa. StemExpress is informed and believes that, under the Supply Agreement and later the guise of renegotiating it, STEMCELL continued to access and appropriate StemExpress' confidential procurement and manufacturing information for that improper purpose.

In or around 2013, Eric Martinelli ("Martinelli"), a former employee of AllCells, LLC, reached out to StemExpress regarding potential employment. Martinelli made concerning statements regarding willingness to share his prior employer's confidential information with StemExpress. StemExpress rejected this and refused to offer employment to Martinelli.

During the Supply Agreement, StemExpress learned STEMCELL hired Martinelli. StemExpress raised concerns regarding Martinelli, warning STEMCELL of his previous representations to StemExpress regarding willingness to misuse his prior employer's confidential information.

On March 22, 2016, Cate Dyer sent a letter to David Llewellyn, Vice President of Business Operations for STEMCELL, providing: "As I am sure Debra has mentioned over the last few months, some significant concern has continued to come up with regards to the handling of confidential and proprietary information in which Eric Martinelli is exposed to in his employment with STEMCELL." Dyer attached a letter to the email, providing:



parker taylor law group

> Dear David:
>
> I wanted to follow up on recent calls regarding STEMCELL Technologies' handling and protecting confidential information belonging to StemExpress. As you are aware, StemExpress and STEMCELL are parties to two agreements: 1) Supply Agreement, dated May 1, 2014, and 2) Confidentiality Agreement, dated September 2, 2012. Each of these agreements has provisions requiring STEMCELL to protect, and restrict the use of, any confidential information provided by StemExpress to STEMCELL. Recent events have caused some concern about STEMCELL's handling of StemExpress's confidential and proprietary information and the purpose of this letter is to highlight the obligation of STEMCELL to protect this confidential information. …
>
> As I have discussed with STEMCELL management, that we understand one of your employees, Eric Martinelli, has shared certain confidential information with employees of Allcells relating to the relationship between StemExpress and STEMCELL. I have discussed the concerns with Debra Sauve and Lynn Csontos and have asked each of them to review and make changes to the handling of StemExpress's Confidential Information, an example of this request is that I have asked Lynn to remove Eric from Quality Assurance meetings with StemExpress. There is also a concern whether Eric has shared confidential information of Allcells with STEMCELL. Eric's lack of respect for past employer's confidentiality is highly concerning, as one could conclude that he would behavior similar if he left STEMCELL's employment.
>
> I want you to know that StemExpress very much values the relationship that it has developed with STEMCELL and our intent in this letter is to protect and keep our relationship healthy. I am raising these concerns to highlight an issue and to give a heads up to STEMCELL. I would ask that STEMCELL revisit the confidentiality and intellectual property provisions in our agreements with its employees and impose appropriate safeguards before any more significant issues arise.

StemExpress is informed and believes that during Martinelli's employment with STEMCELL, at the direction, ratification, and/or knowledge of Eaves, he and other STEMCELL employees and agents were given access to StemExpress' confidential procurement and manufacturing operations information. Despite StemExpress' attempts to remove Martinelli from meetings with StemExpress, StemExpress is informed and believes that STEMCELL continued to provide Martinelli access to said confidential information, had Martinelli working behind the scenes on Canventa.

After the Supply Agreement terminated, StemExpress later learned of a new company called Canventa. As part of its investigation, StemExpress discovered that Allen Eaves incorporated Canventa in 2018.

As was later discovered, STEMCELL was simultaneously engaged in extensive auditing of StemExpress manufacturing and while accessing, appropriate and using StemExpress' confidential information for its attempt to knockoff StemExpress' business. StemExpress is informed and believes



parker taylor law group

that, for the purposes of forming and operating Canventa, STEMCELL shared, provided, exchanged, disclosed, exploited, consulted with, benefitted from, or otherwise misused StemExpress' confidential information and trade secrets.

On February 18, 2018, STEMCELL emailed with StemExpress to set and confirm dates for auditing its Folsom, California facilities. This was STEMCELL's first audit in three years, previously having conducted audits in 2013, 2014, and 2015.

On February 28, 2018, Allen Eaves registered Fundamenta, Inc., a new Delaware corporation, to do business in California.

On March 6, 2018, one week later, STEMCELL sent an audit agenda for StemExpress' Folsom, California facilities to occur on April 17, 2018. This audit, noticed pursuant to the Supply Agreement, included extensive access into StemExpress' procurement facilities and interrelated manufacturing operations. Even compared to the audit agendas submitted as part of the previous STEMCELL audits, STEMCELL provided a lengthy and detailed list of confidential aspects of StemExpress' procurement and manufacturing facilities and business that it sought to review. The audit agenda included, *inter alia*:

> Tour of Facility – to include but not be limited to: following the step by step process of sample receipt and storage of samples, processing samples, testing samples, segregation and storage of final product, shipping of product
>
> Document Review – to include but not be limited to procedures relating to:
>
> - Regulatory and Quality Profile - # employees/shifts, org chart, subcontractors, Quality Policy/Manual (RA)
> - Logistics/Sample Management – sample collection , storage, processing, and segregation (QA)
> - Donor history questionnaires, and testing. Method for identification of repeat donors (RA)
> - Patient consent forms and confidentiality (RA)
> - IRB approvals (RA)
> - Label controls and reconciliation process, verification and approval (QA/RA)
> - Sample Coding and Sample Traceability (RA)
> - System for the identification and investigation of post-donation information, errors, accidents and adverse reactions (RA)
> - Batch records (QA)
> - QC Test Methods (QA)
> - Product Specifications – how are they set, captured, and met? (QA)
> - Release of Product (QA)



parker taylor law group

- Certificate of Analysis (CoA) generation process (QA)
- Document Control (QA)
- Change Control (QA)
- Complaints, Advisory Notices and Recalls (QA/RA)
- CAPA (Non-conformances, Deviations, Supplier Corrective Actions, Complaints, Audit Schedule, Trending) (QA)
- Stability program (QA)
- Training Program – training logs, job descriptions, CVs, HIPAA (RA)
- Equipment Program – SOPs, Identification, Calibration, Maintenance, Qualification (apheresis machine, rate-controlled freezer), waste disposal (QA)
- Audit Program (QA)
- Verification of previous audit findings

During the same period, on April 5, 2018, Allen Eaves filed amended registration reflecting a change in corporate name from "Fundamenta, Inc." to "Canventa Life Sciences, Inc." Then, on April 17, 2018, STEMCELL obtained access and conducted its extensive audit of StemExpress' Folsom, California manufacturing operations at its headquarters, collection facility, and laboratory, following its agenda. As alleged *supra*, STEMCELL made further specific requests of StemExpress and its employees for additional confidential information throughout this period.

On May 16, 2018, STEMCELL applied to register the design misand work mark CANVENTA LIFE SCIENCES with the USPTO (Serial No. 87924443).

On September 7, 2018, STEMCELL sent to StemExpress a 6-page QUALITY AUDIT REPORT. The audit report reflected access to and included extensive and detailed confidential and proprietary information about StemExpress. The access, audit, and audit report were—especially when combined with the extensive other confidential information requested and provided to STEMCELL under the Supply Agreement—a comprehensive roadmap to StemExpress' confidential procurement and manufacturing processes, systems, procedures, including confidential information about donor collections and laboratory operations. In the report and at that time, StemExpress is informed and believes that Counter-Defendants concealed their plan to secretly form Canventa and operate it by replicating and using the confidential procurement and manufacturing information that they had misappropriated from StemExpress.

As further part of their undisclosed plan, on October 3, 2018, STEMCELL sent an audit agenda regarding a planned audit of StemExpress' Boston site. StemExpress' Boston site, like its other facilities, includes procurement and interrelated manufacturing operations that involve donor



parker taylor law group

collection operations, laboratory activities, and general business activities. STEMCELL's Boston audit agenda was nearly identical to the Folsom audit agenda.

Unbeknownst to StemExpress, the very next day on October 4, 2018, Counter-Defendants applied for building permit number B2018-0173 with the City of Emeryville. The building permits and plans list the Tenant or Project Name as "Stem Cell / Canventa" and appear to identify both companies as the tenant. The plans prominently depict Canventa and STEMCELL's logos, names, and addresses. The permits identify the Description of Work as "TI for office to lab, office & clinic." The listed valuation for proposed Work was $940,640. By this time, StemExpress is informed and believes, including from inspecting public building records, STEMCELL had or would soon spend additional hundreds of thousands of dollars in purchasing the same procurement and manufacturing equipment as StemExpress and that they had accessed and documented as part of their audits and inquires, including the combination of specific equipment known to be utilized by StemExpress. With the knowledge and use of StemExpress' confidential procurement and manufacturing information, Defendants were essentially able to replicate, through Canventa, StemExpress' procurement and manufacturing operations. As was later discovered, senior officials at STEMCELL were actively concealing Canventa from StemExpress and Dyer at the time, even worrying that they may get caught during the renegotiations of the Supply Agreement. During this time, StemExpress was unaware of the existence of Canventa or STEMCELL's plans to use StemExpress' confidential procurement and manufacturing operations information to form, open and operate Canventa, who would be a direct competitor of StemExpress.

Less than two weeks later, on October 17, 2018, STEMCELL conducted a full access audit of StemExpress' Boston site. On November 6, 2018, STEMCELL sends to StemExpress the Boston site audit report.

StemExpress is informed and believes that STEMCELL, through its agents and employees including but not limited to Debra Sauvé, David Llewellyn, Luba Metlitskaia, and/or Eric Martinelli, misappropriated, exploited, and misused StemExpress' confidential information and trade secrets, and did so at the direction, knowledge, and/or ratification of Third Party-Defendant Eaves.

/ / /

parker taylor law group

StemExpress is informed and believes that Counter-Defendants formed this plan in part as a result of StemExpress' refusal to include an ability to purchase StemExpress as part of the Supply Agreement. As a result, STEMCELL worked relentlessly to systematically obtain as much confidential information as possible about StemExpress' procurement and manufacturing operations, with the intent of misusing said information to form and operate a competing procurement and manufacturing facility, Canventa. STEMCELL did so with the benefit of its years of "deep dive" access to StemExpress confidential information and trade secrets. In fact, StemExpress is informed and believes that Counter-Defendants even selected the location for Canventa, being in the San Francisco Bay Area, as a result of StemExpress' active plans at the same time to open its next procurement and manufacturing laboratory facility in San Francisco. StemExpress is informed and believes that Counter-Defendants engaged in flagrant violations of obligations owed to StemExpress and gross misuse of StemExpress' confidential information and trade secrets.

In or around April 2019, within just days of STEMCELL shutting down the Supply Agreement renegotiation efforts with StemExpress, STEMCELL promoted Martinelli to "Managing Director" of Canventa. StemExpress is informed and believes STEMCELL promoted Martinelli at the direction of its CEO, Third Party Defendant Eaves, because of the Martinelli's actions, role and willingness to participate in the further misappropriation, exploitation and misuse of StemExpress' confidential information.

**INTERROGATORY NO. 7:**

As to each allegedly misappropriated trade secret, set forth all facts upon which YOU base YOUR allegation that Dr. Allen Eaves knew of, supported, consented to, or ratified the misappropriation.

**AMENDED RESPONSE TO INTERROGATORY NO. 7:**

Responding Party objects on the basis of attorney-client and attorney work product privileges to the extent that communications between Responding Party or their work-product, could be considered responsive. Responding party objects that this request, which seeks "all facts" upon which Responding Party bases an allegation is overbroad, and too burdensome to answer. Responding Party will meet and confer concerning narrowing the scope of this request.



parker taylor law group

Subject to objections, Responding Party responds:

At all times referenced in this response, Allen Eaves was the CEO and founder of STEMCELL. He had access to and, on information and belief, did access and review all of the information and documents referenced in this response including audit reports, quality control meeting minutes, quality control reports, and all other information STEMCELL obtained from StemExpress. On information and belief, Allen Eaves was aware of and directed and/or ratified the actions STEMCELL took to obtain confidential and proprietary information from StemExpress in order to copy StemExpress' business and form Canventa. Those actions include the facts provided response to Interrogatory No. 6, which are incorporated herein by reference.

**INTERROGATORY NO. 8:**

As to each allegedly misappropriated trade secret, set forth all facts that show or tend to show that Dr. Allen Eaves is liable for misappropriation separate and apart from the liability of the corporate Cross-Defendants or that Dr. Allan Eaves was acting outside the scope of his employment.

**AMENDED RESPONSE TO INTERROGATORY NO. 8:**

Responding Party objects on the basis of attorney-client and attorney work product privileges to the extent that communications between Responding Party or their work-product, could be considered responsive. Responding party objects that this interrogatory is compound. Responding party objects that this request, which seeks "all facts" relating to Allen Eaves' misappropriation is overbroad, and too burdensome to answer.

Subject to objections, Responding Party responds:

At all times referenced in this response, Allen Eaves was the CEO and founder of STEMCELL. He had access to and, on information and belief, did access and review all of the information and documents referenced in this response including audit reports, quality control meeting minutes, quality control reports, and all other information STEMCELL obtained from StemExpress. On information and belief, Allen Eaves was aware of and directed and/or ratified the actions STEMCELL took to obtain confidential and proprietary information from StemExpress in order to copy StemExpress' business and form Canventa. Those actions include the facts provided response to Interrogatory No. 6, which are incorporated herein by reference.



parker taylor law group

**INTERROGATORY NO. 9:**

State with specificity what confidential, but non-trade secret, information "concerning [StemExpress's] business, methods, techniques, and processes in the procurement and manufacturing operations, " was allegedly misused by Defendants as alleged in paragraph 77 of the First Amended Counterclaims.

**AMENDED RESPONSE TO INTERROGATORY NO. 9:**

Responding Party objects on the basis of attorney-client and attorney work product privileges to the extent that communications between Responding Party or their work-product, could be considered responsive. Responding party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). In order to substantively respond to this request as phrased, Responding Party would be required to prepare an exhaustive breakdown of every single item of confidential information obtained by STEMCELL during the course of a business relationship with spanned over five years.

Subject to objections, Responding Party responds:

1. Company's ideal donor qualifications.

2. Company's donor screening metrics including information for all of StemExpress' donors in its donor pool over the five-year Supply Agreement.

3. Company's donor scheduling systems, including as developed in and around June 2018

4. Company's acceptable company parameters for product types, including acceptable release ranges for cell count and viability.

5. Company's mobilized donor drug dosing, including frequency and total lifetime ability for company donor.

6. Company's transfer process for samples between refrigeration and liquid nitrogen, including amount of time and impact on cell count and viability.

7. Company's methods of transportation of samples from collection facilities to laboratory facilities.

8. Company's methods of storing samples and completed products.

9. Company's processing times and methods of rolling product.



parker taylor law group

10. Company's stability testing and validation methods.

11. Company's methods for packaging product including preconditioning the shipping box, stability terms, materials used in packaging, and temperature monitoring; size of boxes, and know how to avoid blood tube breakage. This information was provided by StemExpress to SCT in an August 24, 2017 email as well as other calls, emails, and meeting.

12. Company's methods for efficient shipping product.

13. Company's management of media, reagent, and disposables.

14. Company's product and production costs for primary cell isolation laboratory activity.

15. Company's product and production costs for collection centers.

**INTERROGATORY NO. 10:**

Identify all of YOUR customers who purchased cord blood CD34+ from YOU since January 1, 2016.

**AMENDED RESPONSE TO INTERROGATORY NO. 10:**

Responding Party objects that this interrogatory seeks information that is not relevant to the parties' claims or defenses. Responding party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Responding Party objects that this integratory seeks documents for all business activity from Responding Party, which is overbroad, unduly burdensome, and beyond the scope of relevant discovery for this case. Further, Responding Party objects that this interrogatory seeks information that would be subject to confidentiality restrictions by Responding Party's customers. The burden of identifying, compiling, and reviewing such information, plus the burden of notifying each third party of the request and seeking a protective order, is far outweighed by any benefit that may exist. Responding Party objects on the grounds of third-party privacy and confidentiality. Responding Party objects that this request is harassing and pursued for an improper purpose of creating business disruption and interfering with customer relationships. Pursuant to the Court's order on June 14, 2022, Responding Party is seeking to meet and confer with Propounding Party concerning an amended response to this request.

**INTERROGATORY NO. 11:**

Identify all of YOUR customers who purchased leukopaks from YOU since January 1, 2016.

parker taylor law group

**AMENDED RESPONSE TO INTERROGATORY NO. 11:**

Responding Party objects that this interrogatory seeks information that is not relevant to the parties' claims or defenses. Responding party objects that this interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Responding Party objects that this integratory seeks documents for all business activity from Responding Party, which is overbroad, unduly burdensome, and beyond the scope of relevant discovery for this case. Further, Responding Party objects that this interrogatory seeks information that would be subject to confidentiality restrictions by Responding Party's customers. The burden of identifying, compiling, and reviewing such information, plus the burden of notifying each third party of the request and seeking a protective order, is far outweighed by any benefit that may exist. Responding Party objects on the grounds of third-party privacy and confidentiality. Responding Party objects that this request is harassing and pursued for an improper purpose of creating business disruption and interfering with customer relationships. Pursuant to the Court's order on June 14, 2022, Responding Party is seeking to meet and confer with Propounding Party concerning an amended response to this request.

DATED: July 1, 2022

PARKER TAYLOR LAW GROUP, PC

PORT J. PARKER, SBN 179256
MYLES G. TAYLOR, SBN 298687
555 Capitol Mall, Suite 1230
Sacramento, CA 95814
Tel: (916) 996-0400
port@parlawgroup.com
myles@parlawgroup.com
Attorneys for STEMEXPRESS, LLC and CATE DYER

parker taylor law group

**VERIFICATION**

*StemCell Technologies, et al. v. StemExpress, LLC*

UNITED STATES DISTRICT COURT – NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:21-cv-01594

I, CATE DYER, am an authorized representative for StemExpress, LLC, a defendant in this action. I have read the foregoing STEMEXPRESS, LLC'S AMENDED RESPONSES TO STEMCELL TECHNOLOGIES CANADA, INC.'S FIRST SET OF INTERROGATORIES, based on my review of the documents and/or information relevant to these responses, or my knowledge of information based on non-privileged documents and/or related information referenced therein, I certify that the same is true of my own knowledge, except as to those matters which are therein stated upon information or belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on July 01, 2022 at Folsom, California.

CATE DYER

parker taylor law group